**Sol SILVER, Plaintiff,**

v.

**Dr. Earl L. NELSON, Defendant.**

**Civ. A. No. 82–823.**

United States District Court, E.D. Louisiana.

April 12, 1985.

On Motion to Alter or Amend Judgment May 17, 1985.

David Stone, New Orleans, La., for plaintiff.

Normand Pizza, New Orleans, La., for defendant.

## MEMORANDUM OPINION

CASSIBRY, Senior District Judge.

In this diversity case, the plaintiff Sol Silver seeks to hold the defendant Dr. Earl Nelson liable for the loss of close to $200,000 worth of diamonds and rings. The plaintiff delivered the diamonds pursuant to five diamond memoranda, one of which was signed by the defendant.[1] The diamonds were never returned to the plaintiff, nor was he paid for them as promised under the terms of all five memoranda. The plaintiff alleges that the defendant is liable for the diamonds transferred pursuant to the memorandum he signed under the theory of conversion, or alternatively,

---

1. A diamond memorandum is a pre-printed form with blank spaces for the insertion of the date, the name of the recipient of the merchandise, and the items of merchandise delivered. Delivery of merchandise pursuant to a memorandum is in effect a consignment where the consignee assumes full responsibility for the goods and agrees to indemnify the owner the full value of the diamonds as stated on the memorandum.

breach of contract. The plaintiff further alleges that the defendant is liable for the diamonds delivered pursuant to the subsequent memoranda signed by or on behalf of a man using the name Herbert Kaye under three alternative theories of recovery: conspiracy to convert another's property, fraudulent misrepresentation, and negligent misrepresentation.

In addition to the value of the diamonds, plaintiff seeks damages for pain and suffering allegedly caused by the defendant's actions, punitive damages, and legal interest on any sum awarded.

The case was tried before the court, sitting without a jury, briefed, and submitted. After careful consideration, the court now enters the following findings of fact and conclusions of law in support of its judgment.

## FINDINGS OF FACT

1. Plaintiff Sol Silver has been a diamond merchant engaged in buying, selling, and importing diamonds for at least forty years. He has offices in New York City and Israel. Mr. Silver is a resident of the state of New York.

2. Defendant Earl L. Nelson is an ophthalmologist with an office in Metairie, Louisiana. In addition to his medical practice, Dr. Nelson has engaged in the business of buying and selling diamonds. Dr. Nelson is a resident of the state of Louisiana.

3. In approximately the late fall of 1980, Silver and Nelson met in New Orleans, Louisiana through one of their mutual business associates, Gordon Goldman.[2] Nelson represented to Silver that he was interested in purchasing diamonds and knew other prominent individuals who wanted to make significant investments in diamonds. Nel-

son subsequently obtained a diamond from Silver on memorandum, sold it, and paid Silver $500 less than the stated value of the diamond with the promise of more substantial sales in the future.

4. A short time after they met, Silver told Nelson that he was interested in selling the bulk of his merchandise and retiring from the diamond business. Nelson indicated that he knew a group of investors who were interested in purchasing a large quantity of diamonds. From late January to late February 1981, Nelson arranged several meetings in New Orleans in an apparent attempt to precipitate a diamond transaction with this group of investors. Nelson introduced Silver to Robert Webb, his associate and partner in the deal, and Tony Simonetti, a supposed representative of the buyers.[3] Although the particulars of these early meetings are vague, the end result is that no sale was consummated.

A short time after the unsuccessful meetings in New Orleans, Dr. Nelson arranged and paid for a charter flight from New Orleans to Newark, New Jersey in another attempt to effectuate a sale of Silver's merchandise. The plan was that Robert Webb, Detective Robert Poitevent, Nelson's security guard at the previous meetings, and Detective Frank Hibbs, Silver's security guard, were to fly to Newark to collect the money from the investors. At that point, a phone call would be made and Silver would deliver the diamonds to Nelson in New Orleans. The plan was never put into operation, however, because midway through the flight, the pilot was instructed to return to New Orleans. The reason behind the cancellation of the trip was not revealed at trial.

5. In late February or early March of 1981, Nelson contacted Silver in New York

---

**2.** Goldman, Silver's long-time customer, had engineered a number of diamond transactions with Nelson.

**3.** The record is unclear as to the details of Nelson's association with Webb. Nelson claims that Webb told him about the group of investors. Webb, in his deposition testimony, states that Baron Castellano, Undersheriff of Essex

County, New Jersey, informed him about the investors, a group of doctors, who wanted to remain anonymous. Regardless of who told whom about these investors, Nelson represented to Silver that he knew them and had previously done business with them. It is this representation which forms the basis, at least in part, of the plaintiff's law suit.

and requested that he return to New Orleans with a large quantity of diamonds to sell to the investors. Silver arrived in New Orleans on March 5, 1981, and was informed of the newest arrangement: Nelson would take Silver's merchandise to Newark, make the sale, and return to New Orleans. Silver balked at this idea because of the quantity of diamonds involved and insisted that he accompany Nelson to Newark.[4] Nelson attempted to assuage Silver's apprehension by explaining that he had arranged for the diamonds to be insured. Silver, however, remained adamant in his decision to accompany Nelson to Newark. He telephoned his son in New York, Dr. William Silver, from Nelson's office to discuss the proposed transaction.

Dr. Silver testified that he spoke with Nelson at his father's request. Nelson assured Dr. Silver that the group of investors, who insisted upon remaining anonymous, were reputable businessmen with whom Nelson had dealt in the past. Evidently convinced that all would go well, Silver and his son agreed to meet at the Newark airport the following day. Nelson arranged and paid for the flight from New Orleans to Newark for Silver and his security guard Detective Hibbs. By separate flight, Nelson and his security guard Detective Poitevent also traveled from New Orleans to Newark.

6. On the morning of March 6, 1981, a meeting took place in the Eastern Airlines Conference Room at the Newark Airport. The first to arrive were Silver, attended by his security guard Hibbs, Dr. William Silver, Dr. Earl Nelson, attended by his security guard Poitevent, Robert Webb, and Lieutenant McGrath, Webb's security guard. A short time later, four other men arrived: a man introduced by Webb as Herbert Kaye, another introduced as Kaye's diamond expert, Baron Castellano, and one of Castellano's deputies.

As would be revealed, Herbert Kaye, the alleged representative of the investors, was

actually Herbert Kaminsky. In a case with some notable parallels to the one at hand, Kaminsky was tried and convicted of conspiracy to defraud, the use of a wire communication in interstate and foreign commerce in the execution of a scheme to defraud, and inducing an individual to travel in interstate and foreign commerce in the execution of a scheme to defraud in violation of title 18 U.S.C. sections 371, 1343, and 2314. *See United States v. Benson*, 548 F.2d 42 (2d Cir.1977). In addition, Kaminsky had prior convictions in 1967 for violating title 18 U.S.C. section 2315 and in 1976 for mail fraud.[5]

7. At the Newark meeting, Silver and Nelson displayed several diamonds to Kaye. Kaye inspected these diamonds and made disparaging comments about their quality. After some discussion, Kaye suggested that he be permitted to take five specific stones on memorandum in order to have them appraised and to show them to the prospective buyers. Kaye then mentioned the names of various individuals in New Orleans, who could vouch for his integrity. According to Detective Poitevent, Nelson's security guard and witness at trial, Kaye specifically named Carlos Marcello as a reference. Marcello's reputation as a figure in the Gulf Coast Mafia is notorious. Whether Silver knew of his reputation or not is unclear, but Nelson indicated at trial that he did not inform Silver of his identity.

At this point, Kaye and Nelson left the room accompanied by Detective Poitevent. Nelson made several phone calls to verify Kaye's references and testified that he was unable to reach any one. Nelson testified that he tried to call his father-in-law who he thought would know the people Kaye had mentioned. Nelson's father-in-law, Sam DiPiazza, is a native of New Orleans, and according to Dr. Nelson, this fact alone prompted the telephone call. The defendant admitted at trial that Sam DiPiazza was convicted for interstate gambling violations and served time in an Atlanta peni-

---

**4.** Silver testified that he had brought diamonds worth approximately $650,000 to New Orleans.

**5.** Kaminsky's alias, "Kaye," will be used throughout the remainder of this opinion for clarity and brevity.

tentiary. Nelson refused to concede that this had anything to do with his decision to call on DiPiazza to verify Kaye's references, but, in any case, did not tell Silver about his father-in-law's criminal background.

Nelson then called Silver out into the hall where he explained that several of the investors would not be available to inspect the merchandise until later that day or the next. Nelson further explained that the transaction would be decided on the basis of the five stones which Kaye had selected. The men returned to the conference room where more discussion took place. According to Dr. William Silver, Nelson represented to him that he had been able to verify Kaye's references and that there was no reason for concern. Dr. Silver testified that he and his father agreed to deliver the diamonds to Kaye on the condition that Nelson sign the memorandum and take full responsibility for the merchandise. Nelson complied with this request, filled out the memorandum, dated it, and signed his name. Silver took the memorandum and gave the stones to Nelson who in turn passed them to Kaye.

8. The memorandum, dated March 6, 1981, lists the five stones given to Kaye at the Newark meeting with their weight and price per carat. The total value of the diamonds, as shown on the memorandum, is $67,915. Silver has never received any payment for these diamonds, nor have the diamonds been returned.

9. The Newark meeting ended shortly after the memorandum was signed with the understanding that Kaye would contact Silver that afternoon or the next morning. Kaye did in fact telephone Silver the following day, March 7, 1981, and informed him that the investors wanted to see some additional merchandise before they would make a purchase. Kaye obtained possession of additional diamonds and rings from Silver under this pretext on four separate occasions in New York. Each time, Silver received a diamond memorandum in exchange for his merchandise, signed in the

first three instances by Kaye, and in the fourth by Gary Sarason, Kaye's alleged associate. These memoranda are dated March 7, 8, 9, and 10 respectively. The total value of the diamonds delivered pursuant to these memoranda and not returned to Silver is $118,492.[6]

10. Silver testified that he telephoned Nelson in New Orleans prior to delivering additional merchandise to Kaye in New York. Silver contends that each time Nelson assured him that he could deliver diamonds to Kaye with impunity since Nelson knew the investors whom Kaye allegedly represented. Nelson continuously vouched for the reputation and honesty of the investors. The plaintiff's testimony on this point was corroborated by his son Dr. William Silver. Nelson admits that Silver repeatedly telephoned him during the days following the Newark meeting. However, Nelson claims to have cautioned Silver to deliver additional merchandise only after obtaining from Kaye previously delivered diamonds.

The evidence compels acceptance of the plaintiff's version of these conversations. Nelson's testimony on this and other points is incredible and inconsistent. Nelson brought Silver into contact with all of the people involved in this transaction. He acted as liaison between Silver and the buyers. Throughout, Nelson advised and directed Silver on how to proceed. The notion that Silver would continually call Nelson for advice in dealing with Kaye as the representative of the buyers, and then act contrary to that advice is not credible.

11. Throughout late March and early April 1981, Silver and his son tried in vain to recover the diamonds. Nelson repeatedly assured Silver that he would recover the diamonds or obtain payment from the investors. At various times Nelson told Silver the diamonds were in Florida or they were being appraised. At one point, Nelson advised Silver that he would be paid in Israel by an alleged vice president of an Israeli bank. Silver traveled to Israel to no avail: the vice president did not exist and

---

**6.** This amount was stipulated to in the pretrial order. Silver testified that Kaye returned three

rings to him and no claim is being made for these diamonds.

there was no money. Silver returned to New York and eventually filed this law suit against Nelson. The total value of the diamonds which were never returned to Silver is $186,397.

## CONCLUSIONS OF LAW

### 1. Jurisdiction

Jurisdiction in this case is founded on diversity of citizenship and venue is proper in the Eastern District of Louisiana. 28 U.S.C. § 1332; 28 U.S.C. § 1391(a).

### 2. Choice of Law

The plaintiff suggests several legal theories upon which the liability of the defendant may be predicated in this case. Before considering the merits of these claims, the court must first consider the issue of legislative jurisdiction; that is, the choice of substantive state law to be applied to the controversy. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In so doing, the court is bound to follow the conflict of laws rules of Louisiana, the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Louisiana courts have now firmly adopted an interest analysis approach to choice of law questions with respect to both torts and contracts, in preference to the former rigid approach of applying the place where the tort was committed or where the contract was executed. *Jagers v. Royalty Indemnity Co.*, 276 So.2d 309 (La.1973); *Sutton v. Langley*, 330 So.2d 321 (La.App. 2d Cir.1976), *writs denied*, 332 So.2d 805, 332 So.2d 820, 333 So.2d 242 (La.1976). Louisiana's brand of interest analysis involves two distinct steps. The first is to determine whether a false or true conflict exists.[7] This determination is made by examining the various competing interests of the states involved with a particular issue. If a false conflict exists, the law of the state with the exclusive interest is applied and the second step is unnecessary. If a true conflict exists, the law of the state with the most significant relationship to a particular issue is applied in accordance with the principles of the Second Restatement of Conflict of Laws. *See Lee v. Ford Motor Co.*, 457 So.2d 193 (La.App. 2d Cir.1984). This two-part analysis must be performed separately for every significant issue in the case, for, under interest analysis, "cases can be expected to arise with some frequency where different states have the greatest concern in the determination of different issues." *Ardoyno v. Kyzar*, 426 F.Supp. 78, 81 (E.D.La. 1976), *quoting*, Reese, *Depecage: A Common Phenomenon in Choice of Law*, 73 Colum.L.Rev. 58, 59 (1973).

In this case, there is no actual or true conflict of laws concerning the issue of the defendant's liability in either contract or tort. A review of the jurisprudence of the three potentially interested states, New York, New Jersey, and Louisiana, reveals that the result will be the same regardless of which state's substantive law is applied. The plaintiff's claims involve basic principles of contract and tort law which are embodied in the laws of all three states. Thus, no policy of any one state will be defeated by the application of the law of any other state. Under these circumstances, there is nothing to prohibit the court from applying the law of Louisiana to the issue of the defendant's liability.[8] Louisiana clearly has an interest in this suit brought against one of its citizens for conduct which occurred, in substantial part, within the state. Louisiana has the further interest of every forum in applying its own law for purposes of ease of application, familiarity, and sound judicial administration.

---

7. A false conflict "occurs when it is found that only a single state has an interest in the application of its law, and that the other state has no interest in the application of its law in the case." *Jagers v. Royal Indemnity Co.*, 276 So.2d 309, 311 (La.1973).

8. A state would be absolutely prohibited from applying its own law only in a false conflict situation, where, by definition, it has no interest in or minimum contacts with the controversy. *See Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930).

The issue of damages, in contrast to that of liability, does present a conflicts of law question because of the plaintiff's claim for punitive damages. Unlike the law of New York and New Jersey, Louisiana law prohibits punitive damage awards in tort cases. The question of punitive damages will be discussed after liability is determined in the first instance.

Having determined that Louisiana law may properly be applied to the issue of the defendant's liability, the court will now address the merits of the case. The plaintiff asserts the claim of conversion and breach of contract for the diamonds transferred pursuant to the memorandum signed by the defendant. For the diamonds transferred to Kaye after the Newark meeting, the plaintiff asserts alternative claims of conversion conspiracy, fraudulent misrepresentation, and negligent misrepresentation. Each of these claims will be discussed in turn.

3. Conversion

■ The common law tort of conversion has long been recognized in Louisiana as a quasi offense under article 2315 of the Louisiana Civil Code.[9] *Lincecum v. Smith*, 287 So.2d 625, 627 (La.App. 3d Cir. 1974) (citations omitted), *aff'd*, 290 So.2d 904 (La.1974). Conversion is generally defined as any wrongful act of dominion over the property of another which is inconsistent with the owner's rights. *Harper Oil Field Services v. Dugas*, 451 So.2d 96, 101 (La.App. 3d Cir.1984) (citations omitted). Liability in conversion may be based on either the original wrongful acquisition of another's property or the subsequent wrongful detention of possession. *Oge v. Resolute Ins. Co.*, 217 So.2d 738, 740 (La. App. 3d Cir.1969). Thus, one who has lawfully obtained possession of property may be liable to the owner for conversion if he refuses to return the property upon demand, or in other words, when permission has ended. *Miller v. Harvey*, 408 So.2d 946, 952 (La.App. 2d Cir.1981).

■ In this case, the plaintiff claims that the defendant converted the diamonds listed on the memorandum dated March 6, 1981, because he failed to return them on demand.[10] According to the terms of the memorandum, the delivery of the diamonds did not constitute a sale, but rather a conditional delivery or consignment. The plaintiff remained the owner of the diamonds and could demand their return at any time. Silver testified that he asked Dr. Nelson to return the diamonds on or about March 10, 1981. Permission having ended, the defendant allegedly converted the plaintiff's merchandise by his failure to return it.[11]

The facts of this case do not support the plaintiff's claim of conversion. At the time Silver made his demand on Nelson for the return of the diamonds, Nelson did not have possession of them. Therefore, Nelson's failure to deliver the diamonds to Silver does not constitute a conversion. The defendant may be liable if he defrauded the plaintiff, or if his negligence contributed to the loss of the plaintiff's merchandise, but he is not liable in conversion for failure to deliver on demand. *See* Restate-

---

9. "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code Ann. art. 2315 (West 1979).

10. The plaintiff also contends that the defendant's failure to pay for the diamonds constituted a conversion. However, the subject of the alleged conversion is the diamonds and not money. The defendant's refusal to pay for the diamonds listed on the March 6 memorandum is more appropriately discussed in the context of the breach of contract claim.

11. The plaintiff does not contend, nor does the court find, that the defendant converted these

diamonds by an initial wrongful acquisition. At the Newark meeting, Silver gave Nelson the diamonds on memorandum and then Nelson, with Silver's knowledge and consent, transferred the diamonds to Kaye. Of course, if the plaintiff sustains his claim that Nelson conspired with Kaye to defraud the plaintiff and convert the diamonds delivered pursuant to the four subsequent memoranda, then presumably a conversion also took place at the Newark meeting. This possibility will be discussed, if necessary, with the conversion conspiracy claim.

ment (Second) of Torts § 237 comment f (1965).

## 4. Breach of Contract

Plaintiff alternatively asserts that the defendant's failure to return or pay for the diamonds listed on the memorandum dated March 6, 1981, constituted a breach of contract. The memorandum, made out to and signed by Dr. Nelson, lists each diamond's weight in carats, the price per carat, and the stated value or total price. The memorandum also contains pre-printed information which reads as follows:

> The merchandise described below is delivered to you on memorandum, at your risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of SOL SILVER and shall be returned on demand, in full in its original form. Until the merchandise is returned and actually received by me, you are fully responsible therefor, and, in the event of damage or loss, whether caused by you or by another, whether or not under your control, you will Indemnify me immediately by payment of the stated value which represents the extent of the actual loss and is not intended to constitute a price for the sale of the merchandise. You acquire no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise, or any part thereof, by memorandum or otherwise, it being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this merchandise. A sale of all or any portion of the merchandise shall occur only if and when I agree and you shall have received from me a separate invoice. A subsequent sale of any specific part of the merchandise shall not affect the terms hereof with respect to the balance hereof. Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary custom of the trade. (THIS IS NOT AN INVOICE OR BILL OF SALE)

■ Initially, the defendant argues that the memorandum, which he admittedly signed, functions solely as a receipt for the merchandise and therefore cannot be breached. Despite this argument, the defendant then directs the court to case law which establishes that a diamond memorandum, such as the one involved in this case, serves both as a receipt and as a contract.[12] Based on the terms of the memorandum, the applicable case law, and general contract principles, I find that the memorandum in this case has such a dual role.

Dr. Nelson's signature on the memorandum evidences that he received the diamonds. In addition, the terms of the memorandum set out the obligations and liabilities of the recipient as well as the conditions under which the recipient may dispose of the merchandise. These terms are clearly contractual in nature. Nelson testified that he had used diamond memoranda on several occasions in the past, and in fact, had transacted business with Silver through an identical diamond memorandum on one prior occasion. Furthermore, Nelson's testimony revealed that he fully ap-

---

12. One of the cases cited by the defendant in his post-trial brief is *Lipschutz v. Gordon Jewelry Corp.*, 373 F.Supp. 375 (S.D.Tex.1974) which provides a detailed description of diamond memoranda and their use in the diamond industry. The court was unable to locate Louisiana case law directly on point, but general principles of contract law adopted by Louisiana support the conclusion that a diamond memorandum is both a receipt and a contract. *See generally Southern States Equipment Co., Inc. v. Jack Legett Co., Inc.*, 379 So.2d 881 (La.App. 4th Cir.1980), *writ denied*, 381 So.2d 1232 (La.1980). *See also Frank Mastoloni & Sons, Inc. v. U.S. Postal Service*, 546 F.Supp. 415 (S.D.N.Y.1982); *Baumgold Brothers, Inc. v. Allan M. Fox Co., East*, 375 F.Supp. 807 (N.D.Ohio 1973).

preciated the purpose of the memorandum in question.[13]

The defendant also argues that he never had possession of the diamonds and therefore, never accepted the responsibilities imposed by the terms of the memorandum. I have already found as fact that Dr. Nelson did take possession of the diamonds at the Newark meeting, albeit only temporarily. Dr. Nelson himself testified that he accepted the merchandise.

▇▇▇ Neither party argues that the March 6 memorandum is ambiguous, nor do I find it to be. Absent a latent or patent ambiguity, the meaning of a contract is a matter of law to be decided by the court. *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467, 471 (5th Cir.1981) (citation omitted). The memorandum clearly states that the recipient assumes full responsibility for the merchandise until its return to the owner. The recipient is liable for the full value of the merchandise in the event of its loss regardless of fault. Thus, the defendant's failure to return or pay for the diamonds listed on the memorandum constituted a breach of contract. As stated in the March 6 memorandum, the plaintiff is entitled to receive the stated value of the diamonds listed or $67,915.

Having found the defendant liable for the diamonds transferred at the Newark meeting, I now turn to the question of the defendant's liability for the diamonds transferred to Herb Kaye after the Newark meeting.

## 5. Conversion Conspiracy

The plaintiff's first theory of recovery, labeled conversion conspiracy, asserts that the defendant conspired with Kaye to defraud the plaintiff and convert his merchandise. The essence of the defense to this claim is that the record contains no evidence of collusion between Dr. Nelson and Herb Kaye. The defendant contends that both he and the plaintiff were innocent victims of Kaye's scheme.[14]

▇▇▇ Louisiana law provides that "[h]e who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, *in solido*, with that person, for the damage caused by such act." La.Civ.Code Ann. art. 2324 (West 1979). Louisiana courts have interpreted article 2324 as creating liability for acts performed pursuant to a conspiracy which cause injury or damage to a plaintiff. *Miller v. Keating*, 339 So.2d 40, 43 (La.App. 3d Cir.1976) (citations omitted), *modified*, 349 So.2d 265 (La.1977). The actionable element in an article 2324 claim is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part. *Id.; see also Tabb v. Norred*, 277 So.2d 223, 227 (La.App. 3d Cir.1973), *writ refused*, 279 So.2d 694 (La. 1973).[15] Thus, to recover, a plaintiff must

---

13. In response to questions on cross examination, Dr. Nelson testified as follows:

> Q Dr. Nelson, your purpose in filling out and signing this memorandum was to get merchandise from Mr. Silver to sell to Mr. Kaye; isn't that correct?
> A Yes, sir.
> Q Is it also correct, sir, that you signed your name on this memorandum in Plaintiff Exhibit No. 4 in order to accept the merchandise?
>
> \* \* \* \* \* \*
>
> A And I accepted the merchandise when I got my receipt.

This testimony also reveals that there was adequate consideration to support the contract.

14. The defendant initially objects to this theory of recovery on the ground that it was raised for the first time in the plaintiff's post-trial brief.

The defendant's objection is unfounded. Although the specific phrase "conversion conspiracy" is absent from the pretrial order, the essence of the claim is clearly stated: "The defendant acted in collusion with Herb Kaye for the purpose of wrongfully obtaining possession of the plaintiff's diamonds without payment." Collusion is the equivalent of conspiracy "being an agreement between two or more persons to defraud another of his rights or to obtain an illegal object." 15A C.J.S. *Conspiracy* § 1(1) (1967).

15. The principle that a conspiracy in and of itself does not give rise to civil liability is well settled. *See Cullen v. BMW of North America, Inc.*, 490 F.Supp. 249, 254 (E.D.N.Y.1980); *Landriani v. Lake Mohawk Country Club*, 26 N.J.Super. 157, 97 A.2d 511 (N.J.Super.Ct.App.Div. 1953); 15A C.J.S. *Conspiracy* § 1(1) (1967).

prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury. *Thomas v. City of New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982).

■ In this case, the plaintiff relies on circumstantial evidence to show that the defendant made an agreement with Kaye to convert the plaintiff's diamonds. Circumstantial evidence is often the only available evidence in proving a conspiracy since "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." *Id.* However, I find, after a careful review of the entire record, that the plaintiff has failed to prove by a preponderance of the evidence that such a conspiracy did exist.

In support of his conspiracy claim, the plaintiff points to the fact that the defendant assumed responsibility for the diamonds delivered to Kaye at the Newark meeting by signing the March 6 memorandum. The plaintiff argues that Nelson would not have done this had he not been part of Kaye's scheme. The plaintiff also relies on the defendant's actions after all the diamonds had been delivered to Kaye as proof positive of a conspiracy: the defendant's continued contacts with Kaye, his repeated assurances to the plaintiff concerning the recovery of the merchandise, his representations concerning the whereabouts of the diamonds, as well as his directions that payment would be made in Israel.

I remain unconvinced by this litany of evidence that a conspiracy did in fact exist. None of the defendant's actions are inconsistent with his professed role as the broker or promoter of the sale. The plaintiff as well as the defendant had contact with Kaye after the final delivery of merchandise. The fact that the defendant contin-

ued to be available to the plaintiff even after Kaye had all the diamonds undercuts the conclusion that he was in collusion with Kaye. The evidence preponderates in favor of finding that the defendant did attempt to recover the plaintiff's merchandise and that his representations concerning its whereabouts were obtained in large part from Kaye. Although the defendant may have acted negligently or wrongfully towards the plaintiff, these acts alone do not make him a conspirator unless they were committed pursuant to a mutual agreement with Kaye. I find that the record contains insufficient evidence to establish such an agreement. In the absence of the necessary connection between Nelson and Kaye, the plaintiff's claim for conversion conspiracy must fail.

### 6. Fraudulent Misrepresentation

■ The plaintiff next asserts that the defendant is liable for the diamonds delivered to Kaye subsequent to the Newark meeting under a theory of fraudulent misrepresentation. In general, the elements of establishing a claim of fraudulent misrepresentation may be stated as follows: (1) a misrepresentation of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury.[16] A claim of fraud must be proved by clear and convincing evidence. *Hall v. Arkansas-Louisiana Gas Co.*, 368 So.2d 984, 993 (La.1979). The standard of clear and convincing proof requires more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *American Cyanamid Co. v. Electrical Indus., Inc.*, 630 F.2d 1123, 1127 (5th Cir. 1980). Fraud is never presumed and may not be inferred from circumstances which "at the most create only suspicion." *Poirier v. Collector of Revenue*, 417 So.2d 410,

---

**16.** The definition of legal fraud is expressed in article 1847 of the Louisiana Civil Code:

> Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other.

La.Civ.Code Ann. art. 1847 (West 1952).

Delictual recovery for fraud is provided for in article 2315, the general tort provision of the Civil Code. *See supra* note 9. The jurisprudence surrounding fraud under article 1847 has been held to apply to tort actions. *Equilease Corp. v. Smith Int'l, Inc.*, 588 F.2d 919, 923 n. 4 (5th Cir.1979).

**518**

413 (La.App. 1st Cir.1982), *quoting, Davis v. Comm'r,* 184 F.2d 86, 87 (10th Cir.1950). Based on these legal principles, the testimony at trial, and the entire record in this case, I find that the plaintiff has failed to meet his burden of proving a claim of fraudulent misrepresentation against the defendant.

In support of his claim, the plaintiff points to various instances where the defendant allegedly misrepresented or concealed material facts. The plaintiff asserts that the defendant misrepresented his knowledge of and relationship with Kaye. This allegation is unsupported by the evidence. The defendant testified that his first contact with Kaye was at the Newark meeting. The plaintiff failed to prove either that this was not true or that the defendant represented otherwise to him. As additional support for the fraud alleged, the plaintiff relies on the defendant's failure to divulge the identity of Carlos Marcello or his father-in-law's criminal background. However, the plaintiff failed to show that his course of conduct would have been any different had the defendant disclosed this information. The record indicates that Silver was aware of the type of people with whom he was dealing. His son, Dr. William Silver, testified that at the Newark meeting, Dr. Nelson told him the reason behind Kaye's disparaging remarks about the diamonds was not because of their lack of quality, but rather because of the presence in the room of various police officers. According to Nelson, Kaye did not want the police to know that he was "going to be taking the deal." Furthermore, Silver's testimony indicated that he had conducted a good amount of business in New Orleans over the years. Thus, it might reasonably be inferred that Silver was quite familiar with New Orleans and knew of Marcello in any event.

The plaintiff's last two grounds for fraud fail because the requisite element of intent to deceive or defraud is missing. The plaintiff asserts that he relied to his detriment on the defendant's promise to take responsibility for the diamonds delivered to Kaye at the Newark meeting, as well as for the entire transaction. This promise was obviously not kept. However, there is no proof that the defendant made this statement with the intent not to perform it. Statements of intent can form the basis for a claim of fraud, if the speaker had no such intent at the time the statement was made. *Automatic Coin Enter., Inc. v. Vend-Tronics, Inc.,* 433 So.2d 766, 768 (La.App. 5th Cir.1983), *writ denied,* 440 So.2d 756 (La.1983). The intention of a promissor cannot be established solely by proof of his nonperformance. Restatement (Second) of Torts § 530 comment d (1977). "[N]or does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into." *Id.* The jurisprudence is clear that fraud cannot be imputed by broken promises alone, but must be based on a person's intent not to perform. The plaintiff has failed to show that the defendant had such intent at the time he made the statement in question.

The plaintiff's final and most convincing allegation of fraud is based on the defendant's statements concerning the investors. Prior to the Newark meeting, the defendant represented to the plaintiff and his son that he knew the investors and had previously done business with them. After the Newark meeting, the defendant continued to vouch for the reputation and integrity of the investors. The defendant admitted at trial that he had no personal knowledge of or prior dealings with the investors purportedly involved in this transaction.[17]

17. When questioned on cross-examination, the defendant attempted to explain by saying that he "knew the people by Mr. Webb telling me about the person." When pressed further about his representations that he knew the investors, the people for whom Kaye supposedly worked, Nelson stated, "I knew the people by talking to them on the telephone." The defendant testified that he did not remember any of the names of the people that Kaye worked for, except for one man named Mickey, who was not one of the people he was referring to when he told the

Although the defendant continually assured the plaintiff that he knew the people for whom Kaye worked, in fact, he did not. Thus, the defendant had no basis for telling Silver that he could deliver diamonds to Kaye on memorandum with impunity. The evidence is clear that the defendant misrepresented his knowledge of and relationship with the investors. However, the evidence is neither clear nor convincing that the defendant did so with the intent to deceive or defraud the plaintiff.

Nelson's role in this transaction was as Silver's agent or broker in that he arranged and negotiated the deal on Silver's behalf.[18] Nelson testified that he had hoped to make a commission from any sale of Silver's merchandise. The plaintiff argues that this financial interest provides the necessary intent to deceive on the part of the defendant: if the plaintiff had refused to turn over more diamonds to Kaye, there would have been no sale, and no commission for the defendant. However, if the plaintiff delivered his merchandise to a swindler, the defendant likewise would realize no gain. The defendant's knowledge of the investors was, at best, second hand. But there is no evidence that he knew of any cause for alarm or had any hint of the events to come. The defendant attempted to recover the diamonds or secure payment for them, and he continued to assist the plaintiff in this effort even after the light began to dawn on Kaye's duplicity. That the defendant was negligent and lacking in good judgment was well demonstrated at trial. The clear and convincing evidence that he

intended to defraud the plaintiff is simply absent from this case.

### 6. Negligent Misrepresentation

As a final alternative, the plaintiff argues that the defendant's representations concerning his knowledge of the investors, their trustworthiness, and the actual circumstances surrounding the proposed sale constituted a breach of duty sufficient to subject him to liability under a theory of negligent misrepresentation. The defendant initially interposes a procedural defense to this claim which must be addressed before turning to the merits. The defendant protests that the claim of negligent misrepresentation was raised for the first time in the plaintiff's post-trial brief. Claiming unfair surprise and prejudice, the defendant asks the court to disregard this theory of liability.

#### a. Federal Rule of Civil Procedure 15(b)

Federal Rule of Civil Procedure 15(b) answers the defendant's procedural attack and provides in relevant part as follows:

> When issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

Finding that the claim of negligent misrepresentation is not raised by the pleadings, the task before the court is to determine whether the issue was tried by express or implied consent.[19] Express con-

---

plaintiff that these were "good people." In fact, according to the defendant, Mickey was very nasty and made threats. When questioned about the people he had told the plaintiff were nice and good people, Nelson testified, "I knew them, just like, you know, that I know anybody else that I talk to for two or three hours on the telephone at a time, trying to get Mr. Silver's goods back for him." The defendant further admitted that he did not start talking to these "nice people" until four days to two weeks after the Newark meeting which was after all the merchandise had been delivered to Kaye. The defendant was asked, "So, when you represented to Mr. Silver that you knew these people that Mr. Kaye worked for, and that they were nice people, when you made that representation you

were referring to your conversations with people in this garment factory over the telephone whose names you didn't know; is that correct, sir?" His answer: "Yes, sir."

**18.** I reject the plaintiff's contention that Nelson was one of the investors or buyers in this transaction. I also reject the defendant's characterization of his role as merely a middle man: his involvement extended well beyond simply bringing together the buyers and the seller.

**19.** Arguably negligent misrepresentation is sufficiently raised by the pleadings given the liberal policy behind the Federal Rules of Civil Procedure. However, the issue is absent from the plaintiff's otherwise thorough pretrial memo-

sent may be given by stipulation, or may be incorporated in a pretrial order. 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1493, at 461–62 (1971). In arguing that express consent was given in this case, the plaintiff points to the contested issues of fact listed in the pretrial order. The plaintiff correctly notes that the factual issues raised in the pretrial order form a sufficient basis to assert a claim of negligent misrepresentation. However, these issues are equally relevant to the theory of fraudulent misrepresentation which was clearly asserted in the pleadings as well as the pretrial order.[20] Thus, the contested issues of fact are pertinent to both a pleaded and an unpleaded cause. Express consent will not be inferred from the fact that a collateral and unpleaded issue finds incidental support in the record.

 Implied consent to try an unpleaded issue, sufficient to permit an amendment under Rule 15(b), essentially depends on whether the opposing party would suffer any prejudice by such amendment. *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 369 (5th Cir. 1980) (citations omitted). The test of prejudice is whether the complaining party had a fair opportunity to litigate the issue at trial, and whether that party could offer additional probative evidence on that issue if the case were re-tried. *International Harvester Credit Corp. v. East Coast Truck & R.V. Sales, Inc.*, 547 F.2d 888, 890 (5th Cir.1977). An application of these legal principles to the facts and circumstances of this case demonstrates that the claim of negligent misrepresentation was tried to the court by the consent of the parties under Rule 15(b).

The defendant argues that he will be prejudiced by an implied amendment under Rule 15(b) because the standard for proving fraud is more exacting than that for negligence. The defendant names various witnesses he would have called had he known that negligence, as opposed to fraud, was at issue in this case. Such witnesses, according to the defendant, include Herbert Kaye, Sam DiPiazza, and the insurance agents who allegedly offered to insure Silver's goods while in Nelson's possession from New Orleans to Newark. None of these witnesses could have offered probative evidence concerning the defendant's negligence. The basis of the plaintiff's claim of negligent misrepresentation is the defendant's assertions of personal knowledge of the diamond purchasers. The defendant himself testified that he had no such knowledge of the investors. Although the testimony of such characters as Herbert Kaye would surely have been interesting, neither his testimony nor any additional evidence could have negated the effect of the defendant's own admissions. The witnesses listed by the defendant might either have proved or negated the plaintiff's claims of conversion, fraud, or conspiracy to commit these torts, but have little or no relevance to the claim of negligent misrepresentation.

The defendant also complains that he would have sought a directed verdict on the claim of negligent misrepresentation had he only known that this was an issue at trial. At the close of the plaintiff's case, substantial evidence bearing directly on the defendant's conduct, whether characterized as fraudulent or negligent, had been introduced without objection and was sufficient to overcome a motion for directed verdict. Undoubtedly, the defendant would make

---

randa submitted within one week of trial. The memoranda included the plaintiff's suggested findings of fact and conclusions of law which were to contain "a full exposition of the legal theories that counsel urges." To insure the defendant received full due process on this claim and to negate any effects of hindsight, I will examine the issue of consent as stated in Rule 15(b).

**20.** In the pretrial order, the plaintiff's brief summary of material facts contains the following statement:

> In the alternative, and at the very least, the defendant, for the purpose of obtaining a financial benefit for himself knowingly induced the plaintiff, through intentional misrepresentations, to turn over to Herb Kaye the diamonds listed on the last four memoranda.

different strategic decisions if he could replay the entire trial. However, that alone is inadequate to furnish a finding of prejudice in this case.

Finally, the defendant contends that he is prejudiced by any implied amendment by his inability to litigate the issue of the plaintiff's contributory negligence at trial. This contention is unfounded. First, the defendant's answer specifically alleges the affirmative defense of contributory negligence. Second, the plaintiff's own conduct in this matter was at issue from the beginning and was litigated in full. If the defendant has suffered any prejudice on this point, it has been through his own tactical choices, and not through the decision of the court to address an issue which has been placed into controversy.

The court concludes that no prejudice will befall the defendant by an implied amendment under Rule 15(b) to include the issue of negligent misrepresentation. This issue was tried by the consent of the parties and the merits of that claim will now be addressed.[21]

b. The Merits

■ Louisiana jurisprudence has recognized that the common law tort of negligent misrepresentation is encompassed within the broad language of articles 2315 and 2316 of the Louisiana Civil Code.[22] *Devore v. Hobart Mfg. Co.*, 367 So.2d 836, 839 (La.1979). To prevail on a claim of negligent misrepresentation, the plaintiff must show that the defendant owed a legal duty to him to provide correct information, a breach of that duty, and resultant injury to the plaintiff. *Beal v. Lomas and Nettleton Co.*, 410 So.2d 318, 321 (La.App. 4th Cir.1982); *Josephs v. Austin*, 420 So.2d 1181, 1185 (La.App. 5th Cir.1982), *writ denied*, 427 So.2d 870 (La.1983). In analyzing claims of negligent misrepresentation, Louisiana courts have referred to the Second Restatement of Torts. *Dousson v. South Central Bell*, 429 So.2d 466, 468 (La.App. 4th Cir.1983).[23]

■ The facts and circumstances of this case establish that the defendant owed the plaintiff a duty of providing him with correct information. The defendant created a special relationship with the plaintiff when he undertook to aid the plaintiff in the sale of his merchandise. Nelson initiated this relationship by representing to Silver that he had a group of investors willing and able to purchase the bulk of Silver's merchandise. The defendant presumed to advise and direct the plaintiff in negotiations with the buyers, or their alleged representatives, before, during, and after the Newark meeting. The defendant's testimony that the plaintiff excluded him from the negotiations with Kaye at the Newark meeting is rejected as incredible. The defendant's attempt to characterize his role after the Newark meeting as gratuitous is likewise rejected. The defendant's pecuniary interest in this transaction is established by his own testimony that his purpose in aiding the plaintiff was to secure a commission on any sale.

---

**21.** The second sentence of Rule 15(b) provides that an amendment to conform the pleadings to the evidence may be made at any time, even after judgment. However, a formal amendment is unnecessary. Thus, if an unpleaded issue is fully tried with the express or implied consent of the parties, and no formal amendment is made, the judgment of the court effectuates the amendment.

**22.** Article 2316 provides as follows:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
La.Civ.Code Ann. art. 2316 (West 1979). For the text of article 2315 see *supra* note 9.

**23.** The definition of negligent misrepresentation is set forth in section 552 of the Restatement:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Restatement (Second) of Torts § 552(1) (1977).

The defendant affirmatively asserted that he had firsthand knowledge of the investors and the circumstances surrounding the proposed sale. As discussed above, this assertion was untrue. It was on the basis of his professed personal knowledge that the defendant advised the plaintiff to give additional diamonds to Kaye on memorandum. Thus, the defendant misinformed the plaintiff and breached the duty he owed him to provide accurate and true information.

There is ample evidence of the plaintiff's detrimental reliance on the defendant's misrepresentations. It was solely because of the defendant's assertions concerning the integrity of the investors that the plaintiff entrusted additional diamonds to Kaye after the Newark meeting. Furthermore, the plaintiff's reliance on the defendant was justified. The defendant cultivated the plaintiff's trust in this matter. By his actions and statements, the defendant placed himself in a seeming position of knowledge and authority. He arranged for all the meetings in New Orleans as well as the one in Newark, he arranged and paid for the flights to Newark, and he brought the plaintiff into contact with Kaye and others involved in the transaction. Under these circumstances, the plaintiff was clearly justified in relying on the defendant's advice and representations concerning "his people." Thus, I conclude that the plaintiff has established his right to recover for the negligent misrepresentations of the defendant.

The defendant affirmatively defends the claim of negligent misrepresentation by alleging that the plaintiff's own negligence caused his loss in whole or in part. In support of this defense, the defendant argues that the plaintiff was negligent in delivering close to $200,000 worth of diamonds to Kaye on memoranda. I disagree. As to the first delivery at the Newark meeting, the plaintiff obtained Nelson's guarantee and signature on the memorandum. As to the four subsequent deliveries, the plaintiff first confirmed the delivery with Nelson and then obtained a signed memorandum from Kaye or his associate,

Gary Sarason. The defendant's contention that the plaintiff departed from his usual practice of requiring a cash deposit when transacting business through diamond memoranda is without merit. No evidence was presented that such was ever the plaintiff's practice. I find that the plaintiff acted reasonably and in conformance with his customary business practices.

The defendant further contends that the plaintiff delivered merchandise to Kaye, even though the plaintiff suspected Kaye of stealing five rings from him. This contention is a mischaracterization of the evidence. After a diamond delivery was made to Kaye, the plaintiff discovered that he was missing five rings. The plaintiff's first reaction was to telephone the defendant and confide his suspicion that Kaye had taken the rings. The defendant promised to get to the bottom of what had happened. Kaye admitted that he had the rings and the entire affair was glossed over as a misunderstanding. The next delivery of diamonds to Kaye occurred after these rings as well as three other stones were returned to the plaintiff. The defendant has failed to carry his burden of proving the plaintiff's contributory negligence.

 Finally, the defendant argues that Kaye misled and deceived him as well as the plaintiff. The defendant depicts himself as an unwitting and unwilling participant in Kaye's scheme to defraud the plaintiff. Be that as it may, the defendant is still answerable for his own negligence in this matter. The law provides no impediment to holding a defendant accountable for negligence even where others have contributed to the plaintiff's loss through intentional torts, so long as the defendant is legally at fault. *See Equilease Corp. v. Smith Int'l, Inc.*, 588 F.2d 919, 929 (5th Cir.1979).

c. Damages Recoverable for Negligent Misrepresentation

 The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the

pecuniary loss legally caused by the defendant's misrepresentation. Restatement (Second) of Torts § 552B (1977). I find that the plaintiff suffered the loss of diamonds worth $118,492 as a direct and legal cause of the defendant's negligent misrepresentations in this case.

In addition to the value of the diamonds, the plaintiff seeks an award of general damages for his mental anguish and other such pain and suffering allegedly caused by the defendant's actions. Emotional injury is a separate element of damages for which recovery is available when a preponderance of the evidence establishes both the existence of such injury and its causal connection to the defendant's negligence. *Chappetta v. Bowman Transp., Inc.,* 415 So.2d 1019, 1022 (La.App. 4th Cir.1982). I find that the plaintiff failed to meet his burden of proving the existence of actual injury or that the defendant's actions were the legal cause of such injury. Thus, I decline to award the plaintiff general damages for alleged mental suffering.

### 7. Punitive Damages

Under both New York and New Jersey law, exemplary or punitive damages are recoverable for intentional torts involving moral culpability. *See Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961); *Leimgruber v. Claridge Assoc., Ltd.,* 73 N.J. 450, 375 A.2d 652 (1977). Thus, the plaintiff seeks an award of punitive damages for the intentional torts of conversion and fraudulent misrepresentation.[24] Having found no liability for either of these claims, there is no basis for making an award of punitive damages. Thus, there is no need to reach the conflict of laws problem posed by the fact that Louisiana law prohibits punitive damage awards in tort cases.

Furthermore, even had the plaintiff succeeded in establishing a claim for conversion or fraud, I would decline to make an award of punitive damages.

First, the defendant's conduct in this case was not so reprehensible or malicious, willful, or gross as to warrant the imposition of punitive damages against him. Second, exemplary damages, even if proper in a given case, are not allowed as a matter of right. The decision to award punitive damages, as well as the amount of such damages, rests within the sound discretion of the trier of fact. Exemplary damages are not compensatory, but are used to punish the defendant and deter him and others from the commission of similar conduct in the future. *See* Restatement (Second) of Torts § 908 (1979). The defendant in this case is sufficiently punished by the award of actual damages.

### 8. Interest on the Award

The plaintiff requests that prejudgment interest be awarded in this action. Although the plaintiff fails to specify a rate of interest, he asserts that he is entitled to interest from March 10, 1981, the date the contract was allegedly breached, until the judgment is paid. The plaintiff makes no distinction between an interest award based on a tort claim as opposed to a contract claim. Nor does the plaintiff resolve the question of which state law should control the amount of interest to be assessed. The defendant ignores the issue of damages completely, and thus, offers no aid to the court in the determination of a just and proper interest award.

#### a. Choice of Law

In diversity cases, the issue of interest, both pre- and post-judgment, is controlled by state law. Thus, state law dictates not only the entitlement to interest, but the rate of interest as well. *Home Life Ins. Co., New York v. Equitable Equipment Co.,* 694 F.2d 402, 404 (5th Cir.1982). Interest, as an element of damages, is a matter of substantive law, and therefore, presents a conflict of laws question in this case. Following Louisiana's conflicts rules as described above, the court

---

**24.** Naturally, the claim of conversion conspiracy would likewise provide a basis for the imposition of punitive damages since the underlying tortious conduct would be conversion or fraud.

concludes that Louisiana law properly governs the plaintiff's request for interest.

New Jersey has no interest in resolving the question of a compensatory award of interest as between two nonresident litigants. The state's only contact with the issue presented is the fortuitous circumstance that the March 6, 1981 diamond memorandum was signed in New Jersey. New York clearly has an interest in compensating a resident plaintiff and Louisiana has an interest in judgments rendered in this state against a resident defendant. Louisiana has the further interest of every forum in applying its own law for purposes of ease of application, familiarity, and sound judicial administration. The conflicting interests of New York and Louisiana are resolved by an application of the factors listed in the Second Restatement.[25]

The contract involved in this case is atypical in that there is no place of performance, the subject matter has no specific locus, and the parties had no expectations as to the law which would govern in the event of a dispute. The place of contracting and negotiating is fortuitous as well as irrelevant under the facts and circumstances involved. Thus, the contacts listed in section 188 of the Restatement provide no clear answer in this case. As to the cause of action sounding in tort, the contacts deemed most significant by the court focus

in Louisiana: the relationship between the parties was centered in Louisiana as was the defendant's negligent conduct. The application of Louisiana law to the issue of interest arising out of damages in contract and tort would serve to promote the relevant policies of the forum as well as those of the other interested state. New York's citizen plaintiff will be afforded more than adequate compensation under Louisiana law. The application of Louisiana law will promote the goal of efficient judicial administration since it is the law the forum knows best and is best equipped to apply. Finally, the plaintiff chose Louisiana as the forum state and has failed to meet his burden of proving that New York has an interest in this particular issue which is so compelling as to transcend Louisiana's interest in the application of its substantive law. *See Commercial Union Ins. Co. v. Upjohn Co.,* 409 F.Supp. 453, 458 (E.D.La. 1976).

b. Calculation of Interest

Louisiana law provides for the recovery of legal interest on debts arising out of a contract from the time they become due. La.Civ.Code Ann. art. 1938 (West 1977); *Teledyne Movible Offshore, Inc. v. C & K Offshore Co.,* 376 So.2d 357, 359 (La.App. 3d Cir.1979). Under the terms of the

**25.** In the absence of an effective choice of law by the parties, the measure of recovery for a breach of contract is determined by the local law of the state selected by application of the rules in section 188 of the Restatement. Restatement (Second) of Conflict of Laws § 207 (1971). Section 188 lists the following factors to be taken into account in determining the choice of law in a contract suit:

 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

The Restatement further directs that the law selected by the application of the general principles contained in section 145 determines the measure of damages in a tort claim. *Id.* at § 171. Section 145 lists the following factors:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.

Both section 145 and section 188 are to be applied in accordance with the principles stated in section 6 of the Restatement:

 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.

March 6, 1981 memorandum, the defendant was obligated to return the diamonds or make immediate payment of the stated value upon demand. The plaintiff asserts that demand was made initially on March 10, 1981. I disagree. The evidence indicates that at that point in time, the plaintiff and the defendant were acting together to either finalize the sale or effect the return of the diamonds delivered to Kaye. The only evidence which established a clear demand for payment was the letter written by plaintiff's New York counsel enclosing a copy of the memorandum which the defendant had signed. This letter is dated June 3, 1981. Thus, the plaintiff is entitled to recover legal interest on the amount set forth in the March 6, 1981 memorandum, or $67,-915, at a rate of 7 percent per annum from June 3, 1981 until paid. La.Civ.Code Ann. art. 1938.[26]

The plaintiff is entitled to recover legal interest on the stated value of the diamonds delivered pursuant to the four subsequent memoranda from the date of judicial demand. La.Rev.Stat.Ann. § 13:4203 (West 1968).[27] Thus, the plaintiff may recover interest on the sum of $118,492 at a rate of 12 percent per annum from March 5, 1982 until paid. La.Civ.Code Ann. art. 2924 (West 1952).[28]

In conclusion, the plaintiff shall recover from the defendant a total of $186,397 in damages. Legal interest shall be assessed on $67,915 at 7 percent per annum from June 3, 1981 until paid, and on $118,492 at 12 percent per annum from March 5, 1982 until paid. The Clerk of the Court is directed to enter judgment in accordance with the views expressed in this opinion.

## ON MOTION TO ALTER OR AMEND JUDGMENT

This matter is before the court on the plaintiff's motion to alter or amend the judgment entered April 12, 1985. The plaintiff requests the court to amend the judgment by reassessing the interest rate on the contractual damages of $67,915 at ten percent per annum from June 3, 1981 until September 11, 1981, and at twelve percent per annum from September 11, 1981 until paid. The plaintiff's motion was noticed for hearing on May 8, 1985, and was ordered submitted without oral argument. After careful consideration, the court concludes that the plaintiff's motion must be granted and the judgment amended to reflect the proper rate of interest.

The judgment originally entered in this case awarded interest on the sum of $67,-915 at the legal rate of seven percent per annum in accordance with article 1938 of the Louisiana Civil Code. Effective January 1, 1985, article 1938 was replaced by article 2000 which provides as follows:

When the object of performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the legal rate in effect at the time it is due. The obligee may recover these damages without having to prove any loss.

La.Civ.Code Ann. art. 2000 (West Special Pamphlet 1985). Thus, in contrast to article 1938 which set a specific rate of interest, article 2000 simply directs that the applicable rate is that which is in effect on the date the obligation matures.

The defendant in this case argues that because article 1938 was in effect on the date demand for payment was made, or June 3, 1981, the original interest rate used by the court of seven percent is correct. The defendant's reasoning ignores the com-

---

**26.** Article 1938 of the Louisiana Civil Code provides that "[a]ll debts shall bear interest at the rate of seven per centum per annum from the time they become due, unless otherwise stipulated."

**27.** The statute provides as follows:
Legal interest shall attach from the date of judicial demand, on all judgments, sounding

in damages, "ex delicto", which may be rendered by any of the courts.

**28.** Article 2924, as amended by the Louisiana legislature, provides that "[l]egal interest is fixed .... at twelve percent per annum on all sums which are the object of a judicial demand."

ments to article 2000 which state that the legal rate of interest in force at any given time is set by article 2924 of the Civil Code.[1] That article 2924 controls in this case is clear; the only remaining task is to ascertain its proper application.

Article 2924 delineates three time periods with corresponding interest rates, and directs that the applicable rate is determined by referring to the date on which a lawsuit is filed or pending.[2] With regard to interest resulting from a contractual debt, article 2000 changes the point of reference to the date the obligation becomes due. Following the directions of article 2924 in conjunction with those of article 2000, I conclude that the legal rate of interest in effect at the time payment was owed in this case was ten percent per annum. The remaining question is whether the interest award should be frozen at this rate or permitted to increase to twelve percent per annum as requested by the plaintiff.

■ Recently, in a complex tort case, this court concluded that the Louisiana legislature did not intend for interest to be frozen at the rate in effect on the date suit was filed. *See Todd Shipyards v. Turbine Service, Inc.*, 592 F.Supp. 380 (E.D.La. 1984). Instead, the language of article 2924 evidences a legislative intent to provide for an escalating interest rate to be applied both retrospectively and prospectively. The defendant contends that article 2924, as well as this court's previous interpretation of it, applies only to litigation sounding in tort. However, there is no indication of legislative intent to create two sets of interest rules: one for tort claims, and one for contract claims. On the contrary, article 2000 and its accompanying comments lend strong, if not conclusive, support to the conclusion that article 2924 sets the legal rate of interest in all cases.

The combined application of article 2924 and article 2000 results in an interest award on the sum of $67,915 at ten percent per annum from the date payment was due, or June 3, 1981, until September 11, 1981, and at twelve percent per annum from September 11, 1981 until paid.

Although not specified in the original judgment, I would make clear in the amended judgment that the interest to be assessed in this case is simple interest. Louisiana law does not favor compound interest on awards absent express legislative authority. *Seals v. Morris*, 465 So.2d 140 (La.App. 1st Cir.1985).

In accordance with this memorandum opinion, IT IS ORDERED that the plaintiff's motion to alter or amend the judgment is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court prepare an amended judgment to reflect the views expressed herein.

---

1. The comments provide, in relevant part, as follows:

 (a) This Article is new. It changes the law insofar as it establishes that, when a rate of interest has not been agreed upon, the measure of damages for delay in performing an obligation to pay a sum of money shall be the legal rate of interest in force at the time the sum of money is due. Otherwise, this Article reproduces the substance of C.C. Arts. 1935, 1937, and 1940 (1870).

 (b) Civil Code Article 1836 (1870) has been eliminated as unnecessary. Civil Code Article 1938 (1870) has been eliminated for the same reason. Civil Code Article 2924 (1870) in the title on Loan, states the legal rate of interest. Unnecessary duplication or repetition should be avoided.

2. Article 2924 reads as follows:

 The rate of judicial interest resulting from a lawsuit pending or filed during the indicated periods shall be as follows: (a) Prior to September 12, 1980, the rate shall be seven percent per annum. (b) On and after September 12, 1980, until September 11, 1981, the rate shall be ten percent per annum. (c) On and after September 11, 1981, the rate shall be twelve percent per annum.

 La.Civ.Code Ann. art. 2924 (West Supp.1985).