593 So.2d 769 (1992)
Christina Ciolino Wife of/and Grant BOULMAY
v.
Daniel DUBOIS, Aetna Insurance Company and XYZ Insurance Company.
No. 91-CA-0739.
Court of Appeal of Louisiana, Fourth Circuit.
January 16, 1992.
Edward J. Cloos, III, Discon Law Firm, Metairie, for plaintiff/appellants.
Alan A. Zaunbrecher, Dale Edward Williams, Metairie, for defendant/appellees.
*770 Before SCHOTT, C.J., and LOBRANO and PLOTKIN, JJ.
LOBRANO, Judge.
Plaintiff, Grant Boulmay (Boulmay) appeals the trial court's judgment awarding zero damages. This court must determine whether the jury erred in declining to award general and exemplary damages after finding that Boulmay had suffered injuries in an automobile accident involving a drunk driver.
FACTS:
On September 27, 1985, at the intersection of North Rampart and Governor Nicholls Streets in New Orleans, an automobile driven by Boulmay and containing his wife, Christina Ciolino Boulmay (Mrs. Boulmay),[1] was broadsided by an automobile driven by Daniel Dubois (Dubois). Dubois had run a stop sign. After fleeing the scene of the accident, Dubois was apprehended and found to have a blood alcohol content more than two and a half times the legal limit.
Boulmay was not wearing a seat belt at the time of the collision, and was tossed about inside the car. Soon after the accident, Boulmay noticed discomfort in his neck. Boulmay, who had suffered intermittent neck pain for an eighteen year period prior to the accident, apparently did not initially equate his increased neck pain with the accident. He did not seek medical treatment until February, 1986. He ultimately was examined by five doctors, four of whom testified at trial.
Boulmay and his wife filed suit on May 29, 1986, seeking damages for Mrs. Boulmay's injuries and for Boulmay's loss of consortium. Boulmay did not seek damages for his own personal injuries until December 16, 1986, when the plaintiffs filed a second amended petition. He also sought exemplary damages pursuant to Civil Code Article 2315.4.[2]
Prior to trial, Dubois' insurer, Colonial Lloyd's Insurance Company (Colonial) settled with Boulmay for their policy limits, $10,000.00. Boulmay proceeded to trial, seeking recovery from his uninsured/underinsured carrier, Aetna Life and Casualty Company (Aetna), for injuries to his back and neck. The jury was not informed of Boulmay's $10,000.00 settlement with Colonial.
At the close of Boulmay's case the court granted a directed verdict in his favor on the liability issue. The issue of damages, both compensatory and exemplary was then submitted to the jury. The jury returned the following verdict:
I. COMPENSATORY DAMAGES FOR INJURIES.
A. Did Grant J. Boulmay suffer injuries as a result of the accident of September 27, 1985?
Yes X No ___
B. If so, what amount of damages, in total, if any, would you award to plaintiff Grant J. Boulmay for the injuries you find were caused by the accident of September 27, 1985?
$ 0 [zero]
II. EXEMPLARY DAMAGES FOR DRUNK DRIVING.
A. Do you find that Daniel Dubois was intoxicated while operating a motor vehicle at the time of the September 27, 1985 accident?
YES X NO ___
B. Do you find that Daniel Dubois' intoxication was a cause in fact of accident?
YES X NO ___
C. Do you find that the conduct of Daniel Dubois showed a wanton or reckless disregard for the rights and safety of others?
YES X NO ___

*771 D. If so, what amount, if any, do you award in exemplary damages to Grant J. Boulmay.
$ 0 [zero]
In accordance with the jury's responses, the trial court rendered judgment in favor of Boulmay and against Allstate for zero damages. Boulmay perfects this appeal, arguing that the jury erred as a matter of law in finding that he was injured in the accident but not awarding damages. He further asserts that, factually, there is manifest error in not awarding compensatory and exemplary damages based on the evidence presented.
The issues to be decided are whether the jury was clearly wrong in not awarding general and/or exemplary damages after finding that Boulmay suffered injuries in the accident.
THE EVIDENCE:
Boulmay testified as to neck pain he suffered for an eighteen year period prior to the automobile accident due to an injury incurred playing high school football: "Just a sort of aggravating pain ... Not real sharp. Just there." Boulmay testified that following the accident he began to suffer increased pain in his neck, shoulder, arm, and fingers. He complained of having trouble lying down, sleeping, and feeling comfortable in general. For the first time, he began using a heating pad on his neck. Boulmay's recreational activities have been restricted. For example, he can no longer play golf. Boulmay never missed work due to his injury.
Mrs. Boulmay and her parents testified that Boulmay began to complain of a new type of neck and shoulder pain soon after the accident.
Dr. Robert Lizana, a chiropractor, was the only doctor who examined Boulmay's neck both prior to and after the accident. Boulmay first visited Dr. Lizana on May 22, 1985, four months before the accident, for treatment of a sharp pain in his left middle back which he had incurred while picking up a heavy object. Boulmay filled out a patient form indicating neck pain, as well as numbness in his shoulders, hands, knees, and feet. Boulmay also informed Dr. Lizana of his high school neck injury. Dr. Lizana testified that he treated Boulmay from May 22-June 11, directing most of his attention to thoracic vertebrae T4 thru T7.
Boulmay next visited Dr. Lizana in February 1986, four months after the accident. Dr. Lizana testified that he treated Boulmay from February 1-7, entirely for neck pain. Boulmay did not inform Dr. Lizana of his automobile accident. When asked at trial whether the automobile accident was a likely cause of the neck pain complained of by Boulmay in February 1986, Dr. Lizana testified that Boulmay "definitely had a different problem at that time than when he came in originally. Something took place. He never mentioned anything to me. But that could be it."
Boulmay returned to Dr. Lizana in October 1986, and informed him of the automobile accident. Dr. Lizana conducted a range of motion examination of Boulmay's neck. Dr. Lizana had conducted an identical examination during Boulmay's May 1985 visit. The results of the two examinations were as follows (measurements in degrees):

 May, 1985 October, 1986
Bend head forward 65 20
Extension 50 5 (w/pain)
Rotation: Left 75 45 (w/pain)
 Right 75 25
Lateral Flexion: Left 10 (w/pain) 20
 Right 40 20 (w/pain)

*772 When asked to comment on the range of motion exams, Dr. Lizana testified that the May 1985 exam indicates a normal or nearly normal neck, while the October 1986 exam indicates a quite abnormal or quite less than normal neck.
Dr. Lizana also commented on differences between the May 1985 and February 1986 neck x-rays. Dr. Lizana testified that Boulmay's cervical (neck) vertebrae were straight in May 1985, lacking a natural curve because "something had been going on in the thoracic area." However, by February 1986 Boulmay's cervical vertebrae were bending forward in an unnatural direction. Dr. Lizana testified that the x-rays showed "a significant amount of change from the first time to the second time. Things that I normally wouldn't see through a natural process."
Dr. Lizana continued seeing Boulmay regularly following the October 1986 visit. In April 1987, Dr. Lizana recommended orthopedic treatment. Dr. Lizana testified that the total bill for his services was $3,000.00.
Dr. Marc Friedman, an internist and specialist in gastroenterology, was Boulmay's family physician. He saw Boulmay on a number of occasions prior to the accident for general complaints, such as colds and flus. Boulmay came to Dr. Friedman in January 1986 with a urinary tract problem, but did not complain of neck pain. Boulmay first complained of neck pain to Dr. Friedman in June 1986. On that visit, he specifically denied having been in an automobile accident. After unsuccessful treatment, Dr. Friedman referred Boulmay to an orthopedic surgeon, Dr. Russell Grunsten.
Dr. Grunsten saw Boulmay on only one occasion, on July 1, 1986. Dr. Grunsten was not informed of the high school injury or the automobile accident, but testified that his diagnosis and treatment recommendations would not have been altered by this information. Boulmay complained of arthritic symptoms in his neck during the prior 4-5 months, numbness in his right arm, and pain in his right shoulder during the previous 3-4 weeks. Dr. Grunsten diagnosed Boulmay's right arm as being abnormally weak and small, and testified that "the muscle weakness does indeed strongly suggest that one nerve has been damaged." X-rays showed significant advanced degeneration of discs and vertebrae at the C4-C6 level. Dr. Grunsten found that Boulmay had a severely degenerated neck and stated that "[i]n the middle of his neck, the age process or the degenerative process was beyond his years." Dr. Grunsten also found that Boulmay had a pinched nerve in his neck, a condition which Dr. Grunsten described as painful and one which "normally limits the ability to move the neck and may limit the ability to move his arm ..."
Based on an EMG, Dr. Grunsten recommended physical therapy, with an anterior spinal fusion operation to follow should therapy prove unsuccessful. Dr. Grunsten testified that recommendation of this operation on a first visit was quite unusual, but that Boulmay's combination of mechanical impairment in his neck and neurological deficit in his arm decreased the odds of successful physical therapy. Dr. Grunsten testified that the operation would cost about $15,000.00 in total.
Dr. Grunsten testified that a person with severe spinal degeneration, such as Boulmay, was more vulnerable to injury from traumatic sources than a normal person, and stated that "any accident, any impact where there is going to be significant movement of the head and neck is capable of aggravating this area."
Dr. Grunsten refused to draw a positive connection between the accident and Boulmay's present condition: "If you have an individual who is hit by a car and breaks a leg, he has clearly a direct association. And if in this instance you have an individual who was involved in an accident some 4 or 5 years ago and has an episode of disc herniation ... it becomes difficult to associate these two." On cross-examination, Dr. Grunsten stated that "clearly the auto accident is not the cause of his disc herniation at this time," and that "[t]his process clearly *773 has been going on for some time to develop this degree of change ..." When asked if he could tell what caused Boulmay's problem other than arthritis, Dr. Grunsten stated, "No. I think he had a disc herniation when I saw him ... The question that I cannot answer for you is what caused his disc herniation."
After filing suit, Boulmay's attorney referred him to Dr. S. Daniel Seltzer, an orthopedic surgeon. Dr. Seltzer examined Boulmay on October 10, 1986 and on four subsequent occasions. Boulmay informed Dr. Seltzer of the automobile accident. He complained of pain in his neck and right shoulder, with occasional radiation into his right arm. Based on x-rays from Dr. Lizana, Dr. Seltzer concluded that Boulmay suffered from collapse of the discs between cervical vertebrae C4-C7, as well as foraminal encroachment (calcium deposits and arthritic changes where nerve roots exit the vertebrae).
In order to obtain further information, Dr. Seltzer had Boulmay undergo an EMG, an MRI, and a Catscan. Dr. Seltzer summarized Boulmay's condition as follows:
"I think he had a combination problem. I don't think first of all part of his symptoms come from the radiculopathy, that is from the pinched nerve. I think part of his symptoms may come from the generalized arthritic changes which he has in his neck. And part of his symptoms may come from damages to one or more of the discs which have been damaged as well."
Dr. Seltzer had observed other patients who failed to display symptoms of disc injury for 6-12 months following trauma, and stated that the onset of such symptoms depends on the individual.
Dr. Seltzer felt that Boulmay's high school injury would have had little effect on Boulmay's condition, except perhaps for some degenerative changes at the C3-4 level. He felt that the automobile accident could have caused Boulmay's problems, stating that "if a person who has an arthritic neck is subjected to an equivalent type injury, there is more likelihood there will be ... problems following that." Dr. Seltzer explained that a person with arthritic changes may not have a supple or stretchable spine, and that "[i]f you take tissues which are stiff and not elastic and you stretch them, they may tear and become inflamed. And that's a frequent source of pain and problems." As to the effect of an automobile accident on such a condition, Dr. Seltzer stated, "... the ligaments or the support that hold the discs in are stretched beyond their capacity to take that load. And they're stretched or torn. Sometimes even a hole is caused by that force." When asked if a condition such as Boulmay's could have arisen without some source of trauma, Dr. Seltzer responded, "They can. But when viewing a history of a traumatic incident it's probably more likely that the trauma is the culprit."
An examination of Boulmay by Dr. Seltzer 2-3 weeks prior to trial and some four years after his initial examination indicated that Boulmay's condition had not changed significantly. Dr. Seltzer estimated Boulmay's American Medical Association anatomical rating as 15-20% whole body disability.
On cross examination, Dr. Seltzer admitted that he was unaware that Boulmay had complained to Dr. Lizana of neck pain four months prior to the accident. Dr. Seltzer testified that the total bill for his services was $245.00.
GENERAL DAMAGES:
Although a jury has much discretion in assessing damages, it errs as a matter of law by refusing to award general damages for objective injuries. Crowther v. Kmart Corp., 568 So.2d 669 (La.App. 4th Cir.1990), writ denied, 571 So.2d 656 (La. 1990); Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.1987), writ den. 506 So.2d 1227 (La. 1987); Curry on Behalf of Curry v. Allstate Ins. Co., 435 So.2d 1030 (La.App. 4th Cir.1983); Odendahl v. Wild, 418 So.2d 36 (La.App. 4th Cir.1982); Brown v. Grigsby, 394 So.2d 847 (La.App. 3rd Cir.1981); Griffin v. Bethard, 398 So.2d 639 (La.App. 3rd Cir.1981); Robinson v. General Motors Corp., 328 So.2d 751 (La.App. 4th Cir.1976). In the instant case the jury erred, when *774 after finding that Boulmay was injured in the accident, it awarded zero damages. We must determine the damages to which Boulmay is entitled.
In Curry, supra, this court stated that "[i]n assessing general damages where the jury has erroneously awarded none ... the appellate court [under the guidelines of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and Reck v. Stevens, 373 So.2d 498 (La.1979) ] must award the lowest amount that the jury reasonably could have determined in its discretion." Id. at 1032, citing Odendahl, supra, and Brown, supra (brackets original).
In the past ten years alone, Louisiana appellate courts have reviewed awards of damages for spinal injuries suffered in automobile accidents on nearly one hundred occasions. Our review of these cases leads us to conclude that the lowest amount that the jury reasonably could have determined in its discretion under the facts of this case is $20,000.00.
In awarding damages for pain and suffering due to spinal injuries suffered in automobile accidents, the courts have considered a number of factors, including: the severity and duration of suffering, the degree of temporary/permanent physical impairment, the contribution of preexisting physical conditions to the injury, the length of time required for recovery, the amount of medical attention required, the likelihood of future surgery, the potential danger inherent in foreseeable surgical procedures, the cost of past/present/foreseeable medical treatment, part/future inconvenience and impairment of lifestyle, and past/future lost wages.
Boulmay has suffered chronic neck pain during the five years since the accident. Dr. Seltzer's examination of Boulmay prior to trial indicated that Boulmay's condition had not changed significantly. Dr. Seltzer estimated Boulmay's American Medical Association anatomical rating as 15-20% whole body disability. Boulmay underwent an extensive treatment regimeincluding extended chiropractic care, arthritic drugs, and physical therapywithout noticeable improvement.
Dr. Grunsten recommended an anterior spinal fusion operation should therapy prove unsuccessful. He testified that such an operation would cost about $15,000.00 in total. Our review of the medical bills offered into evidence indicates that Boulmay spent upwards of $4,000.00 on his neck problems. We attribute one-half of the past medical expenses to this accident. We consider the future medical expenses too speculative.
Boulmay testified that he ceased chiropractic care in part because it was too time consuming. In addition, Boulmay testified that he can no longer participate in recreational sports at anywhere near his prior level. Boulmay does not seek recovery for past or future lost wages.
We recognize that the jury may have felt, due to Boulmay's prior degenerative arthritic condition, that his present condition was caused only in small part by the automobile accident. Nonetheless, a tortfeasor takes his victim as he finds him, and is responsible for all natural and probable consequences of his tortious conduct. Walton v. William Wolf Baking Co., Inc., 406 So.2d 168 (La.1981); Perniciaro v. Brinch, 384 So.2d 392 (La.1980). We feel, based on similar injuries in prior cases and considering Boulmay's prior degenerative condition, that the lower limit of the jury's discretion for objective injuries such as those suffered by Boulmay is $20,000.00. This amount is in accord with awards sustained by each of the Louisiana Courts of Appeal in recent cases involving automobile accident neck injuries. See e.g. Kolwe v. Taylor, 517 So.2d 236 (La.App. 1st Cir. 1987); Hastings v. Southern National Insurance Co., 554 So.2d 221 (La.App. 2nd Cir.1989); Simmons v. Custom-Bilt Cabinet & Supply Co., 509 So.2d 663 (La.App. 3rd Cir.1987); Sobol v. State Farm Mutual Insurance Co., Inc., 537 So.2d 375 (La. App. 4th Cir.1988); Young v. Livaccari, 561 So.2d 209 (La.App. 5th Cir.1990).
Accordingly, we raise the damage award (including medical expenses) from zero to $22,000.00. The $10,000.00 Boulmay received from Colonial and the $1,400.00 he *775 received from Aetna, should be credited against this award.
EXEMPLARY DAMAGES:
Boulmay argues that the jury erred in failing to award exemplary damages after finding that all of the elements required for exemplary damages under La.C.C. Art. 2315.4 were present. We disagree.
In Silver v. Nelson, 610 F.Supp. 505 (E.D.La.1985), the court stated: "... exemplary damages, even if proper in a given case, are not allowed as a matter of right. The decision to award punitive damages, as well as the amount of such damages, rests within the sound discretion of the trier of fact." Id. at 523. In addition to this general principle of law, La.C.C. Art. 2315.4 itself affords the trier of fact complete discretion as to whether or not to award exemplary damages. La.C.C. Art. 2315.4 provides:
"In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries." (emphasis added).
In this case, although the jury found all of the elements necessary to impose exemplary damages under La.C.C. Art. 2315.4, it exercised its discretion not to do so. Boulmay argues that this court should follow its holding in Bourgeois v. State Farm Mutual Automobile Ins. Co., 562 So.2d 1177 (La.App. 4th Cir.1990), and award exemplary damages nonetheless. We decline to do so.
In Bourgeois, plaintiffs suffered property damage through the negligence of a drunk driver whose blood alcohol level was over two times the legal limit. The trial court found La.C.C. Art. 2315.4 inapplicable to property damage, but held that even if the article was applicable, insufficient evidence had been presented to meet the "wanton or reckless disregard for the safety of others" standard of La.C.C. Art. 2315.4. We reversed, and awarded $2,500.00 for property damage to each of two plaintiffs.
This case is distinguishable from Bourgeois. In Bourgeois, the drunk driver's liability insurer was cast in judgment. Our determination in that case fulfilled the purpose of Article 2315.4 by imposing a detering award against the offending party's insurer. It is reasonable to conclude in the instant case that the jury felt it would be useless to award exemplary damages against plaintiff's uninsured carrier. Such an award would have absolutely no detering effect on the offending tort feasor. We find that the jury acted well within the discretion afforded by Article 2315.4.
We are mindful of Sharp v. Daigre, 555 So.2d 1361 (La.1990) which holds that a UM carrier can be liable for exemplary damages. However, in that case the fact finder exercised its discretion and found the UM carrier liable. Sharp does not mean exemplary damages are mandatory against the UM carrier.
Accordingly we amend the trial court judgment and award Boulmay a total of $22,000.00 in damages. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
PLOTKIN, J., dissents with reasons.
PLOTKIN, Judge, dissenting in part, with written reasons:
Although I agree with the portion of the majority's decision awarding compensatory damages totalling $22,000 to the plaintiff, Grant Boulmay, I disagree with the portion of the decision denying exemplary damages under La.C.C. art. 2315.4. Thus, I respectfully dissent on that portion of the decision only.
LSA-C.C. art. 2315.4 provides as follows:
In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a *776 motor vehicle was a cause in fact of the resulting injuries.
Unquestionably, the jury found all the necessary elements for recovery under the above article in the instant case. They found specifically that Dubois was intoxicated at the time of the accident, that that intoxication was a cause-in-fact of the accident, and that Dubois' conduct showed a wanton or reckless disregard for the rights and safety of others. Inexplicably, the jury nevertheless refused to award any exemplary damages. The majority affirms this decision, citing the discretionary language of the statute.
Despite the use of the verb "may" in the statute, the jurisprudence on this issue, when given its most reasonable interpretation, mandates imposition of exemplary damages under the circumstances for obvious public policy reasons. See Bourgeois v. State Farm Mutual Insurance Co., 562 So.2d 1177 (La.App. 4th Cir.1990). The majority bases its decision that the award of exemplary damages should be left to the complete discretion of the trial judge on a statement in a federal district court case which has no precedential value to this court.
In Bourgeois, this court automatically reversed a trial court judgment denying exemplary damages upon a finding that all the elements necessary to recovery under La.C.C. art. 2315.4 were present. The trial court had denied the plaintiff's request for exemplary damages based on a finding that the evidence failed to show that the defendant had acted with "wanton and reckless disregard for the safety of others" in addition to her intoxication. Finding sufficient evidence that the plaintiff had indeed acted with "wanton and reckless disregard," this court reversed the trial court's denial of exemplary damages, with no discussion of any discretion on the part of the trial court to award such damages. That decision is now binding precedent in this circuit and should be applied to the instant case. Since the decision requires the imposition of exemplary damages when all the elements of the article are present, the majority improperly fails to reverse.
Additionally, the majority's conclusion that "it would be useless to award exemplary damages against plaintiff's uninsured carrier" because the award would have "absolutely no deterring effect on the offending tort feasor" is misplaced. The Louisiana Supreme Court concluded in Sharp v. Daigre, 555 So.2d 1361 (La.1990) that a plaintiff's UM carrier should be liable for exemplary damages under La.C.C. art. 2315.4 to the same extent as the offending tortfeasor because of the public policy behind the article. The Supreme Court pointed out that UM carriers owe an obligation to the innocent victims of accidents, and concluded that the fact that [p]ayment of damages by insurers to their obligee, the victim "will neither encourage nor discourage drunk driving" should not prevail. Id. at 1364.
I believe that the obvious purpose of the exemplary damages article is best served by consistently imposing penalties when the plaintiff has proven the necessary elements for recovery. Thus, I would impose a hard rule awarding exemplary damages in all such cases when liability is clear, which was the intent of the legislature.
For the above and foregoing reasons, I dissent on the majority's affirmation of the part of the trial court judgment denying the plaintiff exemplary damages under La. C.C. art. 2315.4.
NOTES
[1] Although married at the time of the accident, Boulmay and Ciolino were divorced in September, 1989.
[2] Article 2315.4 provides:

"In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries."