645 So.2d 698 (1994)
Ernest PHELPS, Plaintiff-Appellant,
v.
Richard WHITE, et al., Defendants-Appellees.
No. 94-267.
Court of Appeal of Louisiana, Third Circuit.
October 5, 1994.
Rehearing Denied December 14, 1994.
*699 Laura E. Fahy, Patrick Dennis McArdle, New Orleans, for Ernest Phelps.
Chester James Rothkamm Jr., Baton Rouge, for Richard White et al.
Douglas Nealon Stracener, Baton Rouge, for Martrain Marine.
Before LABORDE, KNOLL and THIBODEAUX, JJ.
KNOLL, Judge.
This personal injury case involves a boating accident on Lake Concordia and raises questions of comparative fault and damages. Ernest Phelps, the surviving husband of Mary Phelps, appeals a jury determination that he was 75% at fault for the death of his wife in a boating accident and that Richard White (hereafter Mr. White), the operator of the other boat involved in the accident, was 25% at fault. Even though the jury found Mr. White 25% at fault, it neither awarded damages in favor of Mr. Phelps for the wrongful death of his wife nor recompensed him for property damages. The jury made no award for punitive damages.
Mr. Phelps contends that: (1) the jury's finding him 75% at fault was clearly wrong; and, (2) the jury's failure to award him damages for the wrongful death of his wife, property damages, and punitive damages is erroneous as a matter of law. We affirm in part, reverse in part, and render.

*700 FACTS
At approximately 4 p.m. on April 25, 1987, Mr. Phelps and his wife, Mary, launched their 14 foot wooden boat equipped with a 25 horsepower engine from the Sportsmen's Lodge and proceeded in a northeasterly direction on Lake Concordia to fish the lake. As the Phelps's boat proceeded from the dock, Mr. White was piloting a 16 foot Arrow Glass bass boat equipped with a 115 horsepower engine; the White boat was travelling parallel to shore and moving from east to west. When Mr. and Mrs. Phelps were approximately 150 feet from shore, Mr. White's bass boat struck their wooden boat on the starboard side at approximately the middle of the boat and became airborne. Mrs. Phelps was thrown into the water and died shortly thereafter from internal injuries associated with the collision of the two boats.
Mr. Phelps sued Mr. White, the owner and operator of the bass boat, Homer Miller, the previous owner of the boat and father-in-law of Mr. White, and Martrain Marine, Inc., the corporation which originally sold the boat and motor. Even though the jury rendered its verdict allocating fault 75% to Mr. Phelps and 25% to Mr. White, it awarded no damages. The trial judge granted judgment in accordance with the jury verdict and further awarded Mr. Phelps a proportionate share of $5,878, the stipulated medical and funeral expenses. Mr. Phelps' subsequent motion for JNOV was denied by the trial court. This appeal followed.

APPORTIONMENT OF FAULT
Mr. Phelps contends that the jury was manifestly erroneous in its assessment of any fault against him. Instead, he argues that Mr. White bears total fault for this boating accident.
For an appellate court to reverse a trial court's factual findings, it must find from the record that a reasonable factual basis does not exist for the trial court's findings and that the record establishes that the findings are clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Accordingly, the reviewing court must do more than simply examine the record for some evidence which supports or controverts the trial court's findings. The appellate court must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993).
The issue which the appellate court must resolve is not whether the trier of fact was right or wrong, but whether the conclusions of the fact finder were reasonable. Id. Even though a reviewing court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where testimonial conflict exists. Id. The rule that questions of credibility are for the fact finder applies equally to the evaluation of expert testimony, unless the expert's reasons are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990).
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Louisiana Supreme Court made it abundantly clear that where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Nevertheless, Rosell further stated that where the documents or objective evidence so contradict the witness's story, or the story is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, a reviewing court may find manifest error or clear wrongness even in a credibility determination. Id.
Applying this standard of review to the specific issue raised in the case sub judice, it is well settled that the jury's allocation of fault is a factual finding which an appellate court will not disturb, unless, upon articulated and detailed analysis and reasons, it is demonstrable that the jury's allocation of fault is clearly wrong. Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La. App.2d Cir.), writs denied, 512 So.2d 1183 and 513 So.2d 1211 (La.1987).
As an introduction to our analysis of this issue, we refer first to the testimony of Captain Claude R. Davenport, Mr. Phelps's expert witness in marine safety. Captain Davenport *701 testified that there are rules of the road for waterways, just like there are for highways. In a crossing situation, he stated that the vessel which has the other vessel on its right (starboard) side is referred to as the burdened vessel and the vessel approaching the right (starboard) side of the other boat is the privileged vessel. If, however, one vessel comes from an angle of 35° from the stern (the rear or back of a boat), this becomes an overtaking situation and not a crossing situation. Thus, the ultimate facts which are determinative of liability rest squarely with the resolution of the question of whether Mr. White was either crossing or overtaking Mr. Phelps's boat.
Mr. Phelps testified that he and his wife were proceeding from the dock area at the Sportsmen's Lodge in a northeasterly direction at approximately 5 to 10 miles per hour. He stated that as he cleared the dock, he noticed a motor boat on his starboard side, running close to the shore at least ¼ mile away which posed no threat to his entry into the lake. He testified that just before the accident he was handling his boat and watching where he was going. However, when his boat was approximately 150 feet from shore, Mr. White's boat struck their boat, hitting Mrs. Phelps and throwing her overboard.
The owner of the Sportsmen's Lodge, Jean Bongiovanni, testified that she saw Mr. White's boat travelling fast and that there was a passenger riding on the pedestal seat of Mr. White's boat. She saw Mr. Phelps's boat idling as it traversed the lake in a northeasterly direction. She observed Mr. White's boat veer to the right toward Mr. Phelps's boat as Mr. White's boat approached the lodge's pier and watched it as it went airborne over Mr. Phelps's boat.
A family consisting of 7 members was fishing from 3 different boats in the area of the accident. Marie Worthey, one of the family members, testified that Mr. White's boat went past them several times, travelling fast and spraying water on their boats. She saw Mr. Phelps's boat drift out from the bank. At about the same time, she observed Mr. White's boat veer to the right and run over Mr. Phelps's boat. She thought that just prior to the accident, Mr. White's boat was going to hit the dock at the lodge. She further stated that immediately prior to the accident she saw Mr. Phelps bent over in his boat working on something and that he was in this position when the boats struck.
Mack Nations, Jr., another family member, testified that he did not witness the accident. He stated, much like Marie Worthey, that Mr. White's boat passed them going approximately 45 to 50 m.p.h. and sprayed three inches of water into their boat. Mr. Nations's wife, Barbara, corroborated her husband's testimony and further said that just before the accident Mr. White's boat was about 30 to 40 feet from the bank.
Another family member, Carolyn Saucier, mirrored the testimony of her family members. She further opined that if Mr. White had not changed course, he would have hit the dock, but instead he hit the Phelps's boat.
Herchel Thurman, a mechanical engineer, was another fisherman on the lake at the time of the accident. He testified that he was running circles in the middle of the lake, dragging a fish scaler which descaled his fish. He observed both Mr. Phelps's and Mr. White's boats. His testimony was that Mr. Phelps's boat was traveling at an idle speed as it moved away from the lodge's dock, and that it never changed course. On the other hand, he observed Mr. White's boat coming a long way down the river close to the bank, casting a white spray from the back of the boat. He testified that when Mr. White was approximately 100 to 150 feet from Mr. Phelps's boat, Mr. White's boat turned to the right and ran over Mr. Phelps's boat. He suggested that based on his vantage point, if Mr. White had not turned right, he would have missed the Phelps's boat. He further said that Mr. White's boat went over the Phelps's boat as if it were a ski ramp; Mr. White's boat became airborne and his passenger was thrown from the bow of Mr. White's boat. He described Mr. White's speed as steady, going at least 40 m.p.h., that Mr. White's boat was riding high in the water, and that it was throwing spray behind it. Thurman further testified that Mr. White's boat struck Mr. Phelps's craft at an angle of 30° to 40°, not 90° as asserted by Mr. *702 White. Finally, Thurman stated that from his point of observation, Mr. White's boat overtook Mr. Phelps's from the stern quarter.
Mr. White testified that he was steering his boat along the shore near the Sportsmen's Lodge searching for gas. A friend of his, Randy Guinn, was seated at the bow of the boat helping him locate a gas source. He stated that he looked straight ahead and that he was travelling 50 to 70 yards from shore. He further stated that his speedometer was not functioning and that based on his experience as an operator of this boat he estimated that he was travelling at a speed of 20 m.p.h. He testified that he never saw Mr. Phelps's boat prior to the accident. He did not remember spraying water on other boats as was related by Marie Worthey and her family. Likewise, he did not remember telling Deputy Dennis Cowan after the accident that the collision was his fault, and that he failed to see Mr. Phelps's boat because he was looking for gas pumps at the lodge. Randy Guinn's testimony corroborated Mr. White's.
Captain Davenport testified as an expert in marine safety. After listening to the testimony of the eyewitnesses and viewing photographs of Mr. Phelps's boat, he concluded that Mr. White's boat was overtaking Mr. Phelps's boat and that Mr. Phelps had the right of way. He premised his opinion on physical evidence of boat damage to Mr. Phelps's boat which indicated to him that Mr. White's boat struck at an angle, not perpendicular to the side of the Phelps's boat and that Mr. Phelps had established his direction of travel in the lake.
Mr. Cole, an attorney and the marine safety expert who testified for Mr. White, concluded from the depositions of Mr. White, Mr. Guinn, who was Mr. White's passenger, and Mr. Miller, who was Mr. White's father-in-law and a previous owner of the boat, from testimony he heard at part of the trial, and his review of photographic evidence of damage to the Phelps's boat, that this was a crossing situation and that the two boats hit at a perpendicular angle because Mr. Phelps's boat was crossing Mr. White's path. He elaborated on the rules of the road by saying that in a crossing situation Mr. Phelps was the burdened or give-way vessel and Mr. White was the privileged or stand-on vessel. He opined that even though Mr. Phelps first saw Mr. White proceeding along shore at a distance of a quarter mile, he was obligated to stay out of Mr. White's path. He explained that under admiralty law and jurisprudence that a vessel proceeding from the dock is a burdened vessel until it establishes its course in the stream. He further stated that after a vessel is designated as the burdened vessel it cannot change its status by changing its course or speed.
Mr. Cole examined the photographic evidence which showed angular damage to the starboard side of Mr. Phelps's vessel, which was the physical evidence relied upon by Captain Davenport to support his contention that Mr. White's vessel was overtaking Mr. Phelps's. He opined that if the vessels had met at a low angle of impact, suggestive of Mr. White's overtaking of Mr. Phelps, then the boats would have bounced apart. Moreover, he opined that Mr. White's boat struck Mr. Phelps's boat almost perpendicularly and the angular damage resulted when Mr. Phelps's boat twisted or turned on impact, creating the effect of an angular crossing. On this basis, he concluded that Mr. Phelps failed to use every means available to ascertain that his entry into the lake could be safely accomplished and that as the burdened vessel, he crossed the path of the privileged vessel of Mr. White's.
After reviewing the testimony of the various witnesses, we find the testimony presented by Mr. White so internally implausible that it was manifestly erroneous for the jury to assign any credibility to the facts presented on his behalf. The testimony of disinterested eyewitnesses conflicted with the version of facts relied upon by Mr. White and Mr. Guinn. Likewise, the evidence shows that the primary testimony which Mr. Cole relied upon in formulating his expert opinion was the depositional testimony of Mr. White, Mr. Miller, and Mr. Guinn. Based on their versions of the facts, Mr. Cole formulated his opinion evidence. Although the record is not clear what portion of the live testimony Mr. Cole observed, there was no evidence to discount testimony such as that of Herchel *703 Thurman, an eyewitness who specifically stated that Mr. White's boat veered from its path and was overtaking Mr. Phelps's watercraft.
Moreover, the record further supports that Mr. Phelps's boat had established its position in the lake at a time when no other boat threatened it and that at no time did it vary from its established course. To the contrary, the record is uncontradicted that the only vessel to change course was Mr. White's. Even Mr. Cole, when presented with the testimony that Mr. White's boat veered suddenly toward Mr. Phelps's, testified that in this scenario there was nothing Mr. Phelps could have done.
In light of the uncontradicted testimony that Mr. White never saw Mr. Phelps's boat, that his concentration was focused on the location of gas pumps along the shore, and the strong testimony from all the other disinterested eyewitnesses on the lake that Mr. White was speeding and driving recklessly, we find that the jury erred in casting any fault to Mr. Phelps. Accordingly, we find that the only verdict supported by the record is that Mr. White was 100% liable for the wrongful death of Mrs. Phelps.

DAMAGES
Mr. Phelps next contends that the jury erred as a matter of law when it found Mr. White partially liable, yet failed to award him any damages for the wrongful death of his wife.[1] He also contends that the jury similarly erred when it failed to make an award for his property damages and his claim that Mr. White be cast with punitive damages under LSA-C.C. Art. 2315.4 (exemplary damages for injuries by a defendant whose intoxication while operating a motor vehicle causes injuries). In rebuttal, Mr. White argues that the jury did not err, contending that Mr. Phelps simply failed to prove his damage claims.
LSA-C.C. Art. 2324.1, the source provision for damages, states that in the assessment of damages in cases of quasi offenses much discretion must be left to the trier of fact. However, the jurisprudence is likewise well settled that a jury errs as a matter of law in refusing to award any damages when the facts of the injury have been clearly proven. Boulmay v. Dubois, 593 So.2d 769 (La.App. 4 Cir.1992). When a jury has erred as a matter of law as opposed to an abuse of discretion, the appellate court must assess the amount of damages unrestricted by Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), since it is in effect making an initial damage award. Mart, supra.
In the present case, we find clear error in the jury verdict. Since it found at least partial liability with Mr. White and evidence of wrongful death damages was presented, we find that it erred as a matter of law in failing to award damages. Accordingly, we will review the record for proof of the items of damages urged by Mr. Phelps and, if proven, will assess them in accordance with the dictates of Mart.
Wrongful death damages. LSA-C.C. Art. 2315.2 grants the surviving spouse a right to recover damages suffered as the result of a wrongful death. The elements of damage for wrongful death are loss of love, affection, companionship, and support, as well as funeral expenses. Mathieu v. State, Department of Transportation and Development, 598 So.2d 676 (La.App. 3 Cir.), writ denied, 600 So.2d 665 (La.1992).
In the present case, Mr. Phelps testified that he was married to the decedent, Mary Phelps, for 22 and ½ years and they had three children, Clint, Holly, and Douglas, 18, 16, and 4 years of age, respectively at the time of the accident. Mrs. Phelps was 38 years of age at the time of the accident. He further stated that he and his wife had a close relationship and that he fished primarily with his wife for approximately the last 15 years. He testified that he and his wife had taken an annual vacation to Lake Concordia *704 for the past 15 years. It was uncontroverted that he missed his wife very much, and that he visited his wife's grave approximately four times a week for a year. He further testified that his children loved their mother and that the older two children have had significant problems since the death of their mother. Mr. Phelps stated that he considered not going on after the death of his wife, but decided otherwise when he realized that he now was the sole guardian and provider for his children, particularly his young son.
Based on this testimony, we find that the jury erred in not awarding Mr. Phelps damages for the wrongful death of his wife. Viewing the evidence before us, we find that an award of $350,000 will compensate Mr. Phelps for this element of damages.
Valuation of Mr. Phelps' boat. Mr. Phelps next contends that the jury erred in failing to compensate him for the loss of his wooden boat.
Although we have been unable to find jurisprudence relative to the loss of a boat, we find the total loss of an automobile analogous. Commenting on the burden of proof, we stated in Holt v. Rapides Parish Police Jury, 574 So.2d 525, 530 (La.App. 3 Cir.1991):
"[I]t is well-settled law that when an automobile is a total loss, the owner is entitled to recover the market value of the vehicle before the accident less its salvage value, if any. Proof of salvage value is an absolute prerequisite to a recovery for the total loss of a vehicle." (citations omitted).
Applying this jurisprudence to the present case, we find that we are unable to recompense Mr. Phelps for this item of property damage. Mr. Phelps, the only person to testify on this item of damages, approximated his loss at $1,400. He did not state what his original purchase price was, what condition the boat was in, or how he arrived at this figure. The only other testimony he had on this issue was that he did salvage the motor.
Based on this sketchy testimony, we find that Mr. Phelps failed to prove by a preponderance of the evidence that he was entitled to $1,400 for his boat.
Exemplary damages. Mr. Phelps next contends that the jury erred in failing to award exemplary damages because Mrs. Phelps's death was caused by the wanton or reckless disregard for her rights and safety by Mr. White's intoxication while operating his boat.
LSA-C.C. Art. 2315.4 provides:
"In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries."
In Whittington v. American Oil Co., 508 So.2d 180, 186-87 (La.App. 4 Cir.1987), writ denied, 512 So.2d 436 (La.1987), our fellow judges of the Fourth Circuit summarized the law on this issue as follows:
"There is no statutory presumption of intoxication in civil matters. The finding of a specific blood alcohol content standing alone is not evidence that an individual is incapable of operating a motor vehicle and does not preclude recovery for damages caused by the negligent act of others.
The mere showing that one has imbibed alcohol prior to involvement in an automobile accident does not per se establish negligence contributing to the accident." (citations omitted).
The Third Circuit has held that although blood alcohol content alone is insufficient to establish causation, corroborative evidence other than expert testimony is sufficient to show that alcohol was a causal factor contributing to the accident. In McDaniel v. DeJean, 556 So.2d 1336 (La.App. 3 Cir.1990), there was no expert testimony presented at trial on the effects of alcohol impairing the defendant's driving ability. Instead, we examined the record as a whole to see whether there was corroborative evidence that intoxication was a cause-in-fact of the accident. In McDaniel, the arresting officer testified that defendant's eyes were bloodshot, that he smelled of alcohol, that he was unsteady on his feet, and that he failed the field sobriety test. When we examined this testimony together with defendant's 0.11 percent blood *705 alcohol content, we found that "the evidence preponderat[ed] that his intoxication was a cause in fact of the accident." Id. at 1340.
Likewise, in Duplechain v. Old Hickory Cas. Ins. Co., 594 So.2d 995 (La.App. 3 Cir. 1992), we addressed a similar issue. In Duplechain, the defendant stopped his car at night in the middle of the road, exited, and began arguing with his wife. The plaintiff was injured when his vehicle collided with defendant's stopped automobile. Defendant's blood alcohol level was 0.24 percent. Even though the trial court referred to evidence of the amount of alcoholic beverages which must be consumed to reach a 0.24 percent level, it did not mention any expert testimony about the effects that alcohol consumption had on the defendant's driving ability. Viewing the events preceding the accident with defendant's blood alcohol level, we concluded that defendant's intoxicated condition was a cause-in-fact of plaintiff's injuries.
In the present case, Mr. White testified that on the day of the accident he drank a couple of beers and nothing else. The record shows that Dennis Cowan, an investigator for the Concordia Parish Sheriff's Department, questioned Mr. White immediately after the accident. He stated that although Mr. White's eyes were bloodshot and that he could detect an odor of alcohol on Mr. White's breath, he could not recollect that Mr. White was swaying or that his speech was slurred. Deputy Cowan further stated that when he ran a breath analyzer test on Mr. White within 1 hour of the accident, Mr. White's blood alcohol level registered 0.05 percent.[2]
Deputy Cowan also stated that since this accident occurred on the water, the Louisiana Department of Wildlife & Fisheries was in charge of investigating whether to charge Mr. White with DWI. No one from Wildlife & Fisheries testified at this jury trial.
Dr. Maurice Gremillion, the acting coroner for Concordia Parish on the day of the accident, stated that alcohol causes a person to react more slowly, decreases his vision, and affects his judgment as to speed and distance. Dr. Gremillion offered no opinion as to whether Mr. White was intoxicated on the day of the accident or whether intoxication was a cause of the fatality. The only other expert testimony presented was that of David Cole, a marine consultant. As a former Coast Guardsman, he corroborated Dr. Gremillion's general testimony on alcohol's affect on the appreciation of distance and reaction time and further testified that he is aware of the statistics which show that 51% of boating fatalities involve a blood alcohol content of 0.04 percent or greater. Mr. Cole did not offer an opinion on whether Mr. White was intoxicated on the day of the accident or whether intoxication caused the tragic accident which resulted in the death of Mrs. Phelps.
Mr. Phelps testified that while attempts were made to resuscitate his wife on the bank, he smelled a strong odor of alcohol on Mr. White, saw Mr. White's bloodshot eyes, and stated that Mr. White's speech was slurred.
Based on this evidence, some of it conflicting, we do not find that Mr. Phelps proved by a preponderance of the evidence that Mr. White's intoxication was shown to the wanton and reckless level established in McDaniel and Duplechain, and thus there was no proof that Mr. White's imbibing of alcoholic beverages was a cause-in-fact of this accident. From the facts presented, it may be that inattention of the boat operator alone was the cause of the accident.
For the foregoing reasons, the judgment of the trial court is affirmed in its rejection of Mr. Phelps's claims for property damage to his boat and punitive damages. The judgment of the trial court is reversed and set aside in its allocation of fault and its rejection of Mr. Phelps's damage claims for the wrongful death of his wife. Accordingly, we recast those portions of the judgment which are in conflict with the opinion of this court.
IT IS ORDERED, ADJUDGED, and DECREED that Richard White is cast with *706 100% fault for the wrongful death of Mary Phelps.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein favor of Ernest Phelps and against Richard White in the sum of Three Hundred Fifty Thousand Dollars and Zero cents ($350,000.00) plus legal interest from the date of judicial demand until paid, representing damages for the wrongful death of Mary Phelps.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of Ernest Phelps and against Richard White in the sum of Five Thousand Eight Hundred Seventy-Eight Dollars and Zero Cents ($5878.00) plus legal interest from the date of judicial demand until paid, representing funeral expenses of $5,079.00 and medical expenses of $799.00 for Mary Phelps.
Costs of trial and this appeal are assessed to Richard White.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] In his appellate brief Mr. Phelps particularly abandons his claims for mental anguish damages for witnessing his wife's death and the survival action for his wife's pre-death terror, pain and suffering. We also note that we are not asked to award damages to the children of Mr. and Mrs. Phelps for the wrongful death of their mother. Accordingly, these items of damages were abandoned.
[2] In a criminal trial, LSA-R.S. 32:662 provides that if the weight of alcohol in the person's blood is 0.05 percent or less, it shall be presumed that the person was not under the influence of alcoholic beverages.